ERIC D. GOLDBERG (SBN 157544)
DAVID M. RILEY (SBN 292087)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4735
Telephone:   310.595.3000
Facsimile:   310.595.3300
Email:        eric.goldberg@us.dlapiper.com
                  david.riley@us.dlapiper.com

Counsel to the Debtor and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>HISTOGEN INC.,<br><br>   Debtor and Debtor-in-Possession. | Case No. 24-01357-JBM11<br><br>Chapter 11 (Subchapter V)<br><br>**NOTICE OF FILING REDLINE OF DEBTOR'S SUBCHAPTER V PLAN [WITH TECHNICAL REVISIONS]**<br><br>**Date: September 17, 2024**<br>**Time: 1:30 p.m.**<br>**Location: Dept. 2, Room 118**<br>**Judge: Hon. J. Barrett Marum** |

**Redline**

ERIC GOLDBERG (SBN 157544)
DAVID RILEY (SBN 292087)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4735
Telephone: 310.595.3000
Facsimile:  310.595.3300
Email:  Eric.Goldberg@us.dlapiper.com
        David.Riley@us.dlapiper.com

Counsel to the Debtor and ~~Debtor in Possession~~Debtor-in-Possession

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 24-01357-~~CL11~~JBM11 |
| HISTOGEN INC., | Chapter 11 (Subchapter V) |
| Debtor and ~~Debtor In Possession~~Debtor-In-Possession. | **DEBTOR'S SUBCHAPTER V PLAN [WITH TECHNICAL REVISIONS]**<br><br>**Dated September 9, 2024** |

**TABLE OF CONTENTS**

**Page**

I.    DEFINITIONS AND RULES OF CONSTRUCTIONS ........................................ 5

    A.    Definitions ........................................................................................ 5

    B.    Interpretation; Application of Definitions and Rules of Construction ...... 16

II.   INTRODUCTION ........................................................................................ 17

III.  BACKGROUND .......................................................................................... 17

    A.    Brief Description and History of the Debtor's Business ...................... 17

    B.    Overview of Capital Structure ............................................................ 18

    C.    Events Leading to Bankruptcy ........................................................... 19

    D.    Preparation of the Plan ..................................................................... 24

    E.    Significant Events During the Subchapter V Case ............................. 24

    F.    Overview of the Plan Structure ................................................ ~~26~~25

    G.    Liquidation Analysis .......................................................................... 27

    H.    Confirmation Not Likely to be Followed by Further Liquidation or Reorganization ................................................................................. 28

IV.   UNCLASSIFIED CLAIMS ........................................................................... 28

    A.    Administrative Expense Claims ......................................................... 28

    B.    Professional Fee Claims .................................................................... 29

    C.    Priority Tax Claims ............................................................................ 30

V.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS 30

    A.    Classification of Claims ..................................................................... 30

    B.    Treatment of Claims and Equity Interests under the Plan .................. 30

    C.    Elimination of Vacant Classes ........................................................... 32

VI.   MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 32

    A.    Funding of Plan ................................................................................. 32

    B.    Vesting of Assets in the Wind-Down Debtor ...................................... 32

    C.    Plan Administrator ............................................................................. 32

    D.    Duties of the Wind-Down Debtor ....................................................... 34

    E.    Agents of the Plan Administrator and Wind-Down Debtor; Payment of Such Agents ..................................................................................... 34

    F.    Limitation of Liability; Exculpation of Plan Administrator. .................... 35

    G.    Directors and Officers ....................................................................... 35

    H.    Dissolution of the Wind-Down Debtor ................................................ 36

VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 36

- 2 -

| | | A. | Rejection of Executory Contracts and Unexpired Leases | 36 |
| | | B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 36 |
| | | C. | Insurance Preservation | 37 |
| | VIII. | | PROVISIONS GOVERNING DISTRIBUTIONS | 37 |
| | | A. | Distributions for Claims and Equity Interests Allowed as of a Distribution Date | 37 |
| | | B. | Manner of Payment | 37 |
| | | C. | Transmittal of Distributions to Parties Entitled Thereto | 38 |
| | | D. | Disputed Claims and Unclaimed Property | 39 |
| | | E. | Saturday, Sunday or Legal Holiday | 41 |
| | | F. | Fractional Cents | 41 |
| | | G. | De Minimis Payments and Distributions | 41 |
| | | H. | Distributions on account of Equity Interests | 42 |
| | IX. | | CLAIMS PROCEDURES | 42 |
| | | A. | Allowance of Claims | 42 |
| | | B. | Claims Administration Responsibilities | 42 |
| | | C. | Estimation of Claims | 42 |
| | | D. | Time to File Objections to Claims | 43 |
| | | E. | Disputed Claims | 43 |
| | X. | | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE | 43 |
| | | A. | Conditions Precedent to Confirmation of the Plan | 43 |
| | | B. | Conditions Precedent to Effective Date | 44 |
| | | C. | Waiver of Conditions | 44 |
| | | D. | Effect of Non-Occurrence of Effective Date | 44 |
| | XI. | | RELEASES, INJUNCTIONS, AND RELATED PROVISIONS | 44 |
| | | A. | Debtor Releases | 44 |
| | | B. | Exculpation | 46 |
| | | C. | Plan Injunction | 46 |
| | | D. | No Discharge | 47 |
| | | E. | Cause of Action Injunction | ~~48~~47 |
| | | F. | Retained Causes of Action | 48 |
| | XII. | | RETENTION OF JURISDICTION | 49 |
| | XIII. | | MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN | 51 |
| | | A. | Modification of Plan | 51 |

- 3 -

| | B. | Effect of Confirmation on Modifications | 52 |
| | C. | Revocation of Plan | 52 |
| XIV. | | REMEDIES FOR DEFAULT | ~~53~~52 |
| | A. | Material Default | 53 |
| | B. | Remedies | 53 |
| XV. | | MISCELLANEOUS | 53 |
| | A. | Immediate Binding Effect | 53 |
| | B. | Headings | 54 |
| | C. | Notices | 54 |
| | D. | Governing Law | 55 |
| | E. | Severability | 55 |
| | F. | No Admissions | 55 |
| | G. | Reservation of Rights | 55 |

Exhibit A:    Amended Liquidation Analysis

- 4 -

## I.    DEFINITIONS AND RULES OF CONSTRUCTIONS

### A.    Definitions

"**503(b)(9) Claim**" means any Claim against the Debtor for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Petition Date, which qualifies as an administrative expense pursuant to 11 U.S.C. § 503(b)(9).

"**Administrative Expense Claim**" means any Claim against the Debtor for costs and expenses of administering the Subchapter V Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate; (b) Allowed Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Subchapter V Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (d) all fees and charges assessed against the Estate pursuant to section 1930 of title 28 of the United States Code; and (e) 503(b)(9) Claims.

"**Administrative Expense Claims Bar Date**" means the deadline for filing requests for payment of Administrative Expense Claims, with the exception of Professional Fee Claims, which shall be the first Business Day that is forty-five (45) days after the Effective Date.

"**Affiliate**" means an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with respect to any Claim or Equity Interest, or any portion thereof, except as otherwise provided herein: (a) a Claim or Equity Interest that is evidenced by a Proof of Claim filed or a request for payment of an Administrative Expense Claim or Professional Fee Claims filed, as applicable (or a Claim or Equity Interest for which a Proof of Claim or request for payment of an Administrative Expense Claim expressly is not or shall not be required to be filed under the Plan, the Bankruptcy

1612664660.1

Code, or pursuant to a Final Order); (b) a Claim or Equity Interest that is listed in the Schedules and Statements as not Contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been filed; or (c) a Claim or Equity Interest that is Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, that with respect to a Claim or Equity Interest described in clauses (a) and (b) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Equity Interest no objection to allowance or priority or a request for estimation thereof has been interposed within the applicable period of time fixed by the Plan (including the Claims Objection Deadline), the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Equity Interest has been Allowed by a Final Order. Unless otherwise specified in the Plan or in an order of the Bankruptcy Court allowing such Claim or Equity Interest, any Claim or Equity Interest that has been or is hereafter listed in the Schedules and Statements as Contingent, unliquidated, or Disputed, and for which no Proof of Claim has been filed, is not considered Allowed.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount that it owes to the applicable Debtor.

"**Armanino**" means Armanino, LLP.

"**Assets**" means any and all real or personal property of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of the Debtor or Wind-Down Debtor, as the case may be, of any nature whatsoever, including, without limitation, all property of the Estate.

"**Available Cash**" means the Debtor's Cash on hand, and any proceeds received

by the Debtor from the liquidation of the Residual Assets, less amounts set aside in the Reserves.

"**Avoidance Actions**" means Causes of Action arising under sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Southern District of California, having jurisdiction over the Subchapter V Case or, if such Bankruptcy Court ceases to exercise jurisdiction over the Subchapter V Case, such court or adjunct thereof that exercises jurisdiction over the Subchapter V Case in lieu of the United States Bankruptcy Court for the Southern District of California.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bar Date**" means the applicable deadline by which Proofs of Claim or requests for allowance and payment of Administrative Expense Claims must be, or must have been, filed, as established by the Bankruptcy Court, including through the Notice of Chapter 11 Bankruptcy Case [D.I. 12] entered by the Bankruptcy Court on April 22, 2024, or the Confirmation Order.

"**Board of Directors**" means Histogen's Board of Directors.

"**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

"**Cash**" means legal tender of the United States of America, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action (including Avoidance

Actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed, or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity, or pursuant to any other theory of law.

"**Claim**" means any past, present, or future claim, demand, action, request, cause of action, suit, proceeding, or liability of any kind or nature whatsoever, whether at law or in equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed, or Contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages or equitable, mandatory, or injunctive relief, or any administrative proceedings, notices of liability, or potential liability, arbitrations, actions, rights, causes of action, or order, and any other "claim" as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

"**Claims Objection Deadline**" means the first Business Day that is ninety (90) days after the Effective Date or such later date as may be approved by order of the Bankruptcy Court upon motion of the Plan Administrator.

"**Claims Register**" means the official register of Claims maintained by the Clerk.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

"**Clerk**" means the clerk of the Bankruptcy Court.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court on the Docket.

"**Confirmation Date**" means the date on which the Confirmation Order is entered

by the Bankruptcy Court on the Docket.

"**Confirmation Hearing**" means the hearing(s) before the Bankruptcy Court at which the Debtor seeks entry of the Confirmation Order, as such hearing(s) may be adjourned or continued from time to time.

"**Confirmation Order**" means the Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

"**Contingent**" means, with respect to any Claim or Equity Interest, or any portion thereof, except as otherwise provided herein, any contingent or unliquidated Claim asserted or which may be asserted against the Debtor.

"**Contract Rate**" means the interest rate at which the Holder of an Allowed Claim is entitled to payment with respect to such Allowed Claim, but only to the extent that interest is payable by contract or applicable law.

"**D&O Policy**" means, collectively, the Debtor's director and officer liability insurance policies, along with any other applicable directors and officers liability insurance policies, including primary insurance, excess insurance, and tail insurance policies.

"**Debtor Release**" has the meaning ascribed to such term in <u>Article XI.A</u> of the Plan.

"**Debtor**" has the meaning set forth in the Introduction of the Plan.

"**Disallowed**" means, with respect to any Claim or Equity Interest, or any portion thereof, except as otherwise provided herein, a Claim or Equity Interest, or any portion thereof that: (a) has been disallowed by a Final Order; or (b) is scheduled as zero, in an unknown amount, or as Contingent, Disputed, or unliquidated.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, including, without limitation, Claims that (a) have not been listed on the Schedules and Statements or have been listed on the Schedules and Statements as unliquidated, disputed, contingent, or at zero dollars,

whether or not such Claim is the subject of a Proof of Claim; (b) are the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules and Statements; or (c) is the subject of an objection or request for estimation filed by the Debtor or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order.

"**Distribution**" means Cash, property, interests in property, or other value to be distributed by the Plan Administrator from the Residual Assets to Holders of Allowed Claims or Equity Interests, or their designated agents, under the Plan.

"**Distribution Date**" means the date determined by the Plan Administrator when Distributions shall be made under the Plan, and which may be the Effective Date.

"**DLA Piper**" means DLA Piper LLP (US).

"**Docket**" means the docket in the Subchapter V Case maintained by the Clerk.

"**Effective Date**" means the first Business Day on which the conditions specified in Article X.B of the Plan have been met, satisfied, or waived.

"**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"**Equity Agent**" means Equinity, formerly known as the American Stock Transfer & Trust Company, LLC.

"**Equity Interests**" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code.

"**Estate**" means the estate of the Debtor created upon the commencement of the Subchapter V Case under section 541 of the Bankruptcy Code.

"**Exculpated Parties**" means, collectively, and in each case in their capacity as such during the Subchapter V Case: (a) the Debtor, (b) each of the Debtor's (i) directors, (ii) officers, and (iii) attorneys, (iv) advisors, (v) agents, and (vi) representatives, in each case with respect to (i) through (vi) serving between the Petition Date and the Effective Date, and (c) each Professional retained by the Debtor, including, without limitation, DLA Piper and Armanino; and (d) Thomas Hubka.

-10-

"**Executory Contract**" means any executory contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Final Decree**" means an order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1 closing the Subchapter V Case.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction enter on such court's docket that: (a) has not been reversed, rescinded, stayed, modified, or amended; (b) is in full force and effect; and (c) is final and non-appealable.  For the avoidance of doubt, no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order, as long as such motion has not been actually filed.

"**First Day Declaration**" means the *Declaration of Dave Maggio in Support of Subchapter V Chapter 11 Petition of Histogen Inc.* [D.I. 3], filed on the Petition Date, and as supplemented on June 17, 2024 [D.I. 51].

"**General Bar Date**" means the deadline established by the Bankruptcy Court for non-governmental units asserting Claims to file Proofs of Claim, which was established as June 27, 2024.

"**General Unsecured Claims**" means, collectively, any Claim against the Debtor that is not (a) a Priority Unsecured Claim, (b) an Administrative Expense Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (e) a Secured Claim, (f) any Claim that constitutes an Equity Interest, and (g) not entitled to priority treatment under the Bankruptcy Code or any order of the Bankruptcy Court.  For the avoidance of doubt, the Harrell Claim is a General Unsecured Claim.

"**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"**Harrell Claim**" means any Claim or Cause of Action asserted by Connie Harrell, her d/b/a, Syndicated Resources, or any Entity or Person controlled by Connie Harrell and/or Syndicated Resources against the Debtor, including, without limitation, proof of claim 4-1 on the Debtor's claims' register.

"**Holder**" means the beneficial holder of any Claim or Equity Interest.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

"**Insurance Policies**" means all insurance policies that have been issued at any time to or provide coverage to the Debtor and all agreements, documents, or instruments relating thereto.

"**Lien**" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

"**Local Rules**" means the Local Bankruptcy Rules and Administrative Procedures of the United States Bankruptcy Court Southern District of California.

"**Net Litigation Proceeds**" means the amount(s) received through assertion or prosecution by the Debtor or Wind-Down Debtor of any Causes of Action, including amounts received by settlement, net of the costs and expenses incurred in connection with the investigation and prosecution of such Causes of Action.

"**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means April 18, 2024, the date on which the Debtor filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and elected to proceed under subchapter V thereunder.

"**Plan**" means this Subchapter V Plan, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Plan Administrator**" means the Person or Entity designated by the Debtor to administer the Wind-Down Debtor and liquidate the Residual Assets in accordance with

the Plan. Armanino shall serve as the initial Plan Administrator.

"**Plan Documents**" means the Plan and any Plan Supplement.

"**Plan Supplement**" means, collectively, the documents, schedules, and exhibits to the Plan to be filed by the Debtor in advance of the Confirmation Hearing.  The Debtor shall have the right to amend any and all documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

"**Priority Tax Claims**" means, collectively, any Claim of a Governmental Unit of a kind specific under section 507(a)(8) of the Bankruptcy Code or section 507(a) of the Bankruptcy Code.

"**Priority Unsecured Claims**" means, collectively, any Claim, other than an Administrative Claim or a Priority Tax Claim, which is entitled to priority under section 507(a) of the Bankruptcy Code.

"**Pro Rata**" means the proportion that an Allowed Claim or Equity Interest, as applicable, in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests, as applicable, in that Class.

"**Professional**" means an Entity employed or retained by the Debtor pursuant to a Bankruptcy Court order and to be compensated for services before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.  For the avoidance of doubt, both DLA Piper and Armanino are Professionals within the meaning of this definition.

"**Professional Fee Claims**" means, collectively, any Administrative Expense Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional through the day immediately preceding the Effective Date to the extent such fees and expenses have not been paid previously, which may include a good faith estimate of such fees and expenses through the Effective Date.

"**Professional Fee Claims Bar Date**" means the deadline for filing requests for payment of Professional Fee Claims, which shall be the first Business Day that is

forty-five (45) days after the Effective Date.

"**Professional Fee Reserve**" means an advance retainer escrowed by the Debtor or Wind-Down Debtor prior to or on Effective Date, or as soon as practicable thereafter, in an amount sufficient to each Professional's Professional Fee Claim.

"**Proof of Claim**" means a proof of Claim or Equity Interest against the Debtor in the Subchapter V Case, substantially in the form of Official Form B 410.

"**Rejection Claims**" means, collectively, any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by any of the Debtor, as limited, in the case of a rejected Unexpired Lease, by section 502(b)(6) of the Bankruptcy Code.

"**Rejection Claims Bar Date**" means the date by which Rejection Claims must be filed, which shall be the latest of: (a) the General Bar Date; (b) thirty (30) days after the entry of an order authorizing the rejection of such Executory Contract or Unexpired Lease; or (c) thirty (30) days after the effective date of the rejection of such Executory Contract or Unexpired Lease, including pursuant to section 365(d)(4) of the Bankruptcy Code.

"**Released Parties**" means, collectively, and in each case in their capacity as such during the Subchapter V Case: (a) the Debtor, (b) each of the Debtor's (i) directors, (ii) officers, (iii) attorneys, (iv) advisors, (v) agents, and (vi) representatives, in each case with respect to (i) through (vi) serving between the Petition Date and the Effective Date, and (c) each Professional retained by the Debtor, including, without limitation, DLA Piper and Armanino.

"**Releases**" means the releases described in Article XI of this Plan.

"**Reserve Amount**" has the meaning ascribed to said term in section VIII.E.

"**Reserve Fund(s)**" means such amount(s) of Cash as the Debtor or Wind-Down Debtor (as appropriate), after consultation with the Plan Administrator, shall determine to be necessary to retain on a Distribution Date through the final Distribution Date, for

the purposes of funding any Distributions to Creditors or Holders of Equity Interests required under the Plan (including, without limitation, distributions on account of Disputed Claims as they become Allowed Claims) and paying expenses incurred and to be incurred relating to the implementation and Consummation of the Plan and the liquidation of the Residual Assets, including, without limitation, the Reserve Amount and such additional amounts as the Debtor or Wind-Down Debtor shall determine and consent to be necessary to be paid after the Effective Date to any Professionals retained by the Plan Administrator or Wind-Down Debtor following the Effective Date in furtherance of the Plan. The Plan Administrator may but need not establish a separate bank account for such purposes.

"**Reserves**" means, collectively, the Reserve Fund and the Professional Fee Reserve.

"**Residual Assets**" means all property of the Estate that has not been sold, transferred, assigned, or disposed of as of the Effective Date; *provided, however*, that Residual Assets shall not include the Cash necessary to establish Reserves or make Distributions to Holders of Allowed Administrative Claims, Allowed Priority Claims, or Allowed Other Priority Claims in accordance with the terms of this Plan.

"**Retained Causes of Action**" means the claims and Causes of Action of the Debtor that are not released, waived, or transferred pursuant to the Plan, a schedule of which may be, but is not required to be, set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time; *provided, that*, for the avoidance of doubt, Retained Actions shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (a) prior to the Petition Date by the Debtor, or (b) pursuant to the Plan, or any Order of the Bankruptcy Court entered in this Subchapter V Case, as the same may be amended, modified, or supplemented from time to time.

"**Schedules and Statements**" means the Schedules of Assets and Liabilities and

Statements of Financial Affairs filed or to be filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Secured Claim**" means (a) a Claim that is secured by a lien on property in which the Estate has an interest, which lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) a Claim Allowed under this Plan as a Secured Claim.

"**Subchapter V Case**" means the case under subchapter V of chapter 11 of the Bankruptcy Code commenced by the Debtor in the Bankruptcy Court, Case No. 24-bk-01357-11.

"**Subchapter V Trustee**" means David A. Wood, as the Person appointed by the U.S. Trustee pursuant to section 1183(a) of the Bankruptcy Code and 28 U.S.C. § 586(e).

"**U.S. Trustee**" means the Office of the United States Trustee for Region 15.

"**Unexpired Lease**" means a lease of real property to which the Debtor is party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

"**Unsecured Claim**" means any Claim that is not an Administrative Expense Claim, a Professional Fee Claim, a Priority Tax Claim, or a Secured Claim.

"**Wind-Down Debtor**" shall mean Debtor Histogen, Inc., on or after the Effective Date; provided, that if the Plan Administrator elects to establish a trust under the terms of this Plan, references to Wind-Down Debtor shall be inclusive of such trust.

**B.    Interpretation; Application of Definitions and Rules of Construction**

The following rules of construction, interpretation, and application shall apply:

- Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

- Unless otherwise specified, each section, article, schedule, or exhibit reference in the Plan is to the respective section in, article of, schedule to, or exhibit to the Plan.

- The words "herein," "hereof," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

- The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

- A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code.

- The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

- Unless otherwise provided, any reference in the Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

- In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**II.    INTRODUCTION**

Histogen, Inc. ("Histogen," the "Company," or the "Debtor"), as debtor in

possession in the above-captioned Subchapter V Case, hereby respectfully submits this Subchapter V Plan under subchapter V of chapter 11 of the Bankruptcy Code.

This Plan provides for a liquidation of Histogen and its assets for the benefit of Holders of Allowed Claims and Equity Interests. Through this Plan, Histogen will establish a Winddown Debtor, administered by the Plan Administrator, into which will flow: (i) all Cash; (ii) the Retained Causes of Action; and (iii) all other Residual Assets.

The Debtor is the proponent of the Plan within the meaning section 1129 of the Bankruptcy Code.

**Your rights may be affected. This Plan contemplates certain discharges, releases, exculpations, and injunctions as set forth in detail in** <u>**Article XI**</u> **that may impact you. Further, the transactions contemplated herein may have tax consequences for you. You should read these papers carefully and discuss them with an attorney, tax advisor, or financial advisor.**

### III.   BACKGROUND

Pursuant to section 1190 of the Bankruptcy Code, the Debtor makes the following disclosures.

####   A.   Brief Description and History of the Debtor's Business

#####     i.   Overview and Formation

Histogen, formerly known as Conatus Pharmaceuticals Inc. ("<u>Conatus</u>"), was incorporated in the state of Delaware on July 13, 2005. Until September 2023, the Company was a clinical-stage therapeutics company focused on developing potential first-in-class clinical and preclinical small molecule pan-caspase and caspase selective inhibitors that protect the body's natural process to restore immune function.

On January 28, 2020, the Company, then operating as Conatus, entered into an Agreement and Plan of Merger and Reorganization, as amended (the "<u>Merger Agreement</u>"), with privately held Histogen, Inc. ("<u>Private Histogen</u>") and Chinook Merger Sub, Inc., a wholly owned subsidiary of the Company ("<u>Merger Sub</u>").

Under the Merger Agreement, Merger Sub merged with and into Private Histogen, with Private Histogen surviving as a wholly owned subsidiary of the Company (the "Merger"). On May 26, 2020, the Merger was completed. Conatus changed its name to Histogen Inc., and Private Histogen, which remains as a wholly owned subsidiary of the Company, changed its name to Histogen Therapeutics Inc.[1] On May 27, 2020, the combined company's common stock began trading on The Nasdaq Capital Market ("Nasdaq") under the ticker symbol "HSTO".

### ii.    Pipeline Assets

Prior to the Petition Date, Histogen owned certain intellectual property, including patent rights related to Emericasan, CTS-2090, and others.[2]  Although the Company was able to sell some of these assets, as discussed below, given the lack of interest shown by potential buyers for any unsold intellectual property assets, Histogen determined that such assets had no value and abandoned all related interests.

### iii.    Cash on Hand

As of the Petition Date, the Debtor's primary asset was approximately $2.76 million in cash on hand.  The cash and all other assets are unencumbered.

### B.    Overview of Capital Structure

### i.    Funded Debt

As of the Petition Date, Histogen has no funded debt obligations and believes that there are no claims asserted against it other than potential unliquidated, disputed, or contingent claims.

### ii.    Material Contracts

As of the Petition Date, Histogen has no active, material contracts with vendors. Previously, the Company was party to a number of material contracts that may impose

---

[1] Histogen intends to dissolve its subsidiaries (none of which are operating) in accordance with applicable state law following confirmation of this Plan.

[2] Additional information regarding Histogen's history, including its pipeline assets, can be found in its SEC filings available at https://www.nasdaq.com/market-activity/stocks/hsto/sec-filings.

contingent liabilities.

### iii.    Authorized and Issued Equity

Histogen was authorized to issue 200,000,000 shares of common stock with a par value $0.0001.  On May 27, 2020, Histogen's common stock began trading on The Nasdaq Capital Market ("Nasdaq") under the ticker symbol "HSTO".  As of the Petition Date, approximately 4.271 million shares of common stock were outstanding.  While Histogen is authorized to issue 10,000,000 shares of preferred stock, none are outstanding as of the Petition Date.  Additionally, as of March 27, 2023, Histogen has 3.1 million warrants outstanding, but the strike price for all is above current over-the-counter trading price, and none are in the money.

### C.    Events Leading to Bankruptcy

#### i.    Prepetition Strategic Transaction Efforts

In 2023, Histogen again required additional liquidity in order to fund and further develop its drug candidates and engaged a banker, H.C. Wainwright & Co., to raise capital.  However, due to constraints in the market, these efforts were unsuccessful.

Beginning on or about July 5, 2023, Histogen decided to pause further development of its programs and commence a process to explore strategic alternatives with the intent to enhance shareholder value. Histogen engaged Roth Capital Partners, LLC ("Roth"), to act as a strategic advisor in this process.  Working together with Roth, Histogen explored all forms of potential strategic alternatives, including an acquisition, merger, reverse merger, other business combination, sale of assets, financing alternatives, licensing, or other strategic transactions involving the Company.

As of the Petition Date, no viable strategic alternatives were available to the Company.

#### ii.    Plan of Dissolution

On September 18, 2023, the Board of Directors of Histogen, after extensive consideration of potential strategic alternatives, approved and adopted a plan of

dissolution (the "Plan of Dissolution") that would include the distribution of remaining cash to stockholders following an orderly winddown of the Company's operations, including any proceeds from the potential sale of any pipeline assets. In order to reduce costs and in connection with the Plan of Dissolution, the Company discontinued all clinical development programs and reduced its workforce, including, as discussed below, the termination of all employees by February of 2024.

In light of the planned dissolution, on September 26, 2023, the Company received written notice from Nasdaq advising the Company that based upon Nasdaq's review and pursuant to Listing Rule 5101, Nasdaq believed that the Company is a "public shell," and that the continued listing of its securities was no longer warranted. As a result, the trading of the Company's common stock was suspended as of the opening of business on October 5, 2023, and on October 12, 2023, Nasdaq filed a Form 25-NSE with the Securities and Exchange Commission ("SEC"), which removed the Company's common stock from listing and registration on Nasdaq.

The Board initially set a special meeting of Stockholders to approve the Plan of Dissolution on December 5, 2023, but this meeting was adjourned periodically due to insufficient stockholder support of the Plan of Dissolution (i.e., not enough shareholders voted to allow for a majority affirmative vote). While stockholders never affirmatively rejected the Plan of Dissolution and the Company achieved support from a quorum (33 1/3% of outstanding common stock), the Company never attained approval of the Plan of Dissolution from holders of a majority of outstanding common stock, as required for dissolution under Delaware law. Of those stockholders that voted, support was overwhelming, with approximately 83% voting in favor of the Plan of Dissolution.

### iii.    Termination of Headquarters and Laboratory Lease

In January 2020, the Company entered into a long-term operating lease (as amended from time to time, the "Lease") with San Diego Sycamore, LLC ("Sycamore") for its headquarters that includes office and laboratory space. The lease commenced on

March 1, 2020 and was set to expire on August 31, 2031, with no options to renew or extend.

On August 7, 2023, Histogen entered into a Lease Termination Agreement (the "Lease Termination Agreement") pursuant to which it and Sycamore mutually agreed to accelerate the termination date to August 31, 2023, subject to a termination fee paid by Histogen of approximately $1.0 million. The Company entered into the Lease Termination Agreement primarily for the purpose of reducing the overall cash commitment and long-term liabilities related to the lease as part of the Company's efforts to pursue potential strategic alternatives at the time. The Lease was terminated effective as of August 31, 2023. The Lease Termination Agreement included a release of claims against Histogen.

### iv.    Allergan Sales Asset Purchase Agreement

On October 3, 2023, the Company entered into an Asset Purchase Agreement with Allergan, pursuant to which Histogen and its affiliates sold to Allergan certain assets, including certain patents and other intellectual property rights, related to Histogen's hypoxia generated growth factor technology. In exchange, Allergan agreed to pay Histogen a purchase price of $2.1 million and agreed to assume certain liabilities as set forth in the Asset Purchase Agreement.

The Asset Purchase Agreement contained customary provisions on, among other things, representation and warranties, and covenants related to the transfer of ownership of the acquired assets and other matters. There are no ongoing or contingent obligations related to this agreement.

In connection with the Allergan transaction, on October 3, 2023, the Company also entered into a Mutual Termination of the Second Amended and Restated Strategic Relationship Success Fee Agreement (the "Lordship Agreement")[3] with Lordship

---

[3] The Lordship Agreement was a commercial agreement that provided for royalties for certain Histogen products.

Ventures LLC,[4] pursuant to which Histogen agreed to pay Lordship a mutually agreed success and termination fee of $400,000 as required by the terms of the Lordship Agreement.

### v.    Genome Opinion Asset Purchase Agreement

On or about December 28, 2023, the Company entered into an Asset Purchase Agreement with Genome Opinion Inc. ("Genome Opinion") pursuant to which Histogen sold to Genome Opinion certain caspase related assets, including certain patents and other intellectual property rights, for a purchase price of $475,000.

### vi.    Reductions in Force

Effective September 30, 2023, Histogen reduced its workforce, including the termination of all but two employees. This reduction in force included the termination of employment of all officers except for Susan Knudson, who effective as of October 1, 2023 served in addition to her role as Chief Financial Officer, Secretary and principal financial officer, as the company's President, Chief Executive Officer and principal executive officer.[5] Steven J. Mento, Ph.D., the company's then President, Chief Executive Officer and principal executive officer, Alfred P. Spada, Ph.D., the Company's then Executive Vice President and Chief Scientific Officer, and Joyce Reyes, the Company's Senior Vice President Regulatory, Quality, Clinical and Technical Operations, were all terminated from all positions of employment with the company, effective as of September 30, 2023. Dr. Mento resigned as a director from the Histogen board of directors effective as of September 18, 2023. Histogen's last two employees were terminated in February of 2024. These two former employees (the Chief Financial Officer and the Controller) remain available to provide information to Histogen.

As of the Petition Date, the Debtor had no employees.

---

[4] As of both September 30, 2023 and December 31, 2022, Lordship controlled approximately 2.8% of the Company's outstanding voting shares.

[5] As discussed below, Ms. Knudson was retained post-petition to serve as an independent member of the Board of Directors.

### vii.    Litigation

Histogen is party to two lawsuits.

<u>Employment litigation</u>.   On or about February 17, 2022, two former employees, each of whom separately resigned and terminated their employment with Histogen, jointly filed a complaint in the Superior Court of California, County of San Diego against Histogen and certain other parties.   The plaintiffs alleged whistleblower status, retaliation, discrimination, unfair business practices, wrongful termination, violation of civil rights, and other California state law claims.  Histogen tendered the complaint to its employment practices liability insurer and engaged outside litigation counsel, as approved by its insurance carrier, to defend Histogen and the other defendants.  Prior to the Petition Date, the Company and one of the plaintiffs reached a settlement agreement covered by the Company's liability insurance.  Histogen believes that this matter will be resolved and that all payments to the remaining plaintiff will come from insurance proceeds.

<u>Warrant-related litigation</u>.   Histogen is also involved in litigation with Connie Harrell and her d/b/a, Syndicated Resources, that has been pending since August of 2018.   Histogen filed a civil lawsuit in late 2018 seeking to rescind a 1-year written contract that was entered into between Histogen and Harrell dated March 16 2016. Ms. Harrell filed a cross complaint in which she asserts claims for breach of contract and fraudulent misrepresentation and fraudulent concealment.  Ms. Harrell alleges that she is entitled to approximately $60,000 in general damages based on non-payment of her consulting fee, and the value of 250000 shares of Histogen common stock.  Histogen disputes these assertions.  There is an order to show cause regarding dismissal set for November 8, 2024.  The suit is stayed pursuant to the automatic stay.

On June 24, 2024, Harrell filed a proof of claim in the amount of $2,400,206.10 and designated Claim 4-1 on the claims' register.  The Debtor does not believe the Harrell Claim has merit and intends object to its allowance concurrently with pursuing

confirmation of this Plan.  **In the event the Harrell Claim is allowed in an amount materially in excess of the Debtor's estimate of $100,000, this may result in reduced or no amounts available for distribution to stockholders.  No distributions will be made until the Harrell Claim is finally resolved.**

            viii.    **Retention of Professionals.**

As noted above, in August 2023, Histogen engaged Armanino to assist it with winding down and, in July 2023, Histogen engaged Roth to explore all forms of strategic transactions.  Beginning in January 2024, the Debtor expanded its engagement of DLA Piper to advise on and assist in implementing both out-of-court and in-court restructuring strategies.

    **D.    Preparation of the Plan**

On the date hereof, the Debtor filed the *Subchapter V Plan* ("Plan").  This Plan may be confirmed by the Bankruptcy Court under section 1191(a) of the Bankruptcy Code as a consensual Plan.

However, insofar as the Bankruptcy Court determines that the Plan is not consensual, the Debtor will seek Confirmation under section 1191(b) of the Bankruptcy Code.  In both scenarios, the Debtor have crafted the Plan to meet the statutory requirements of sections 1191(a), 1191(b), and 1129(a) of the Bankruptcy Code.

In support of this Plan, the Debtor filed the *Declaration of Dave Maggio in Support of Confirmation of the Subchapter V Plan*.  Further in support of the Plan, the Debtor has filed the *Debtor's Brief in Support of Confirmation*.

    **E.    Significant Events During the Subchapter V Case**

        i.    **General**

On April 18, 2024, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and elected to proceed under subchapter V thereunder.  Given the Debtor's lack of operations, there was no traditional "first day" relief requested or necessary.

On April 19, 2024, David A. Wood was appointed Subchapter V Trustee [D.I. 8].

As part of this Subchapter V Case, the Bankruptcy Court has approved the Debtor's retention and employment of DLA Piper as counsel [D.I. 42] to the Debtor, Frank Noble's retention and employment as special litigation counsel [D.I. 67], and Armanino's appointment as financial advisor [D.I. 54].

On April 22, 2024, the Court set June 27, 2024 as the General Bar Date [D.I. 12].

On May 2, 2024, the Debtor filed its schedules of assets and liabilities and statement of financial affairs [D.I. 19, refiled with updated signatures at D.I. 22]. On May 21, 2024, the U.S. Trustee held a meeting of creditors under section 341 of the Bankruptcy Code.

A status conference pursuant to section 1188 of the Bankruptcy Code regarding the Debtor's progress during this Subchapter V Case toward confirmation has been set for July 1, 2024.

### ii.    Transfer of Cash

Immediately following the Petition Date, Histogen worked with its bank, Silicon Valley Bank ("SVB"), to designate its existing bank accounts as "debtor in possession" accounts in accordance with the requirements of the U.S. Trustee's office. As part of this process, on or about May 7, 2024, we determined that Company bank accounts ("Prior SVB Accounts") were actually in the name of Histogen's wholly owned subsidiary, Histogen Therapeutics, Inc. Despite this designation, all funds held in the Prior SVB Accounts were in fact funds of Histogen, itself (collectively, the "Histogen Funds").

To ensure that all Histogen Funds were held in a Debtor account, on May 13, 2024, Histogen opened a new, debtor in possession account (the "New DIP Account") with SVB. On May 28, 2024, substantially all Histogen Funds were transferred from the Prior SVB Accounts to the New DIP Account.

### iii.    Insider Compensation Motion

As part of its negotiations with the U.S. Trustee with respect to retaining

Armanino, the Debtor agreed to add a second board member, Ms. Knudson.  On June 20, 2024, the existing Board passed a resolution naming Ms. Knudson to the Board and appointed her Chairperson.  On June 21, 2024, the Debtors filed a motion for authority to pay Ms. Knudson a fee of $5,000 per month [D.I. 58].  This motion was granted on July 9, 2024.

### F.      Overview of the Plan Structure

The Plan is structured to support the distribution of the Debtor's Assets to stakeholders in accordance with the priority schemes of the Bankruptcy Code.  The Debtor believes that there are sufficient Assets to satisfy creditors in full, and result in a liquidating distribution or dividend to Histogen stockholders. The Plan, in summary, is as follows:

1.  Resolve existing creditors from the existing cash balances of the Debtor;

2.  Determine an adequate level of reserves to retain in order to:

    a.   resolve the anticipated costs of liquidating and winding up the Debtor; and

    b.  resolve the remaining Disputed Claims; and

    c.  provide for any unanticipated claims not known at this time;

3.  Distribute the remaining cash balances of the Debtor (after considering 1 and 2 above) to the shareholders as a liquidating distribution;

4.  Make all final required tax and other regulatory or administrative filings;

5.  Move to a final dissolution of the Debtor.

All Classes of Creditors and Equity Interests are Unimpaired and deemed to accept the Plan.  Therefore, no votes are required of any Class.

Article IV of this Plan sets forth the treatment of certain unclassified Claims, namely Administrative Expense Claims and Priority Tax Claims, which will be paid in full in Cash on the Effective Date, and Professional Fee Claims, which will be paid in full in Cash if and when such Professional's final fee applications are approved by the

Bankruptcy Court and such compensation and expense reimbursement requests thereunder are allowed.

Article V of this Plan sets forth the treatment of the various Classes of Claims and Equity Interests.

Article VI of this Plan sets forth the Plan's means for implementation, including, without limitation, the appointment of a Plan Administrator.

Article VII of this Plan sets forth the Plan's treatment of Executory Contracts and Unexpired Leases.

Article VIII of this Plan sets forth the procedures governing Distributions to be made by the Plan Administrator from the Residual Assets.

Article IX of this Plan sets forth the various claims procedures hereunder with respect to any asserted Claims or Equity Interests.

Article X of this Plan sets forth the conditions precedent to both Confirmation of this Plan and the occurrence of the Effective Date.

Article XI of this Plan sets forth certain Debtor Releases, Exculpations, and Plan Injunctions in favor of the Debtor's Estate and certain parties in interest that have made substantial contributions to the Debtor throughout the Subchapter V Case.

Finally, Articles XII–XV of this Plan set forth various administrative provisions underlying, among other things, the mechanics of this Plan.

**G.    Liquidation Analysis**

In accordance with section 1129(a)(7) of the Bankruptcy Code, under the Plan, each Holder of a Claim or Equity Interest will either accept the Plan or will receive or retain value, as of the Effective Date, that is not less than the amount such Holder would so receive or retain if the Debtor was liquidated under chapter 7 of the of the Bankruptcy Code.

The Debtor's asset primarily consists of (i) Available Cash and (ii) claims and

Causes of Action.[6]  The liquidation, managed by the Plan Administrator, will necessarily provide more value to Holders of Allowed Claims and Equity Interests than would be distributed to such parties in a chapter 7 liquidation, and will do so more promptly.

Liquidation under chapter 7 would result in significantly smaller Distributions, if any, being made to creditors than those provided for under the Plan because (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, when there is already experienced and disinterested management, and (b) potentially other or additional expenses and Claims.

A more detailed and amended liquidation analysis report is appended to this Plan as **Exhibit A** (the "Liquidation Analysis").  The Liquidation Analysis assumes a conversion to chapter 7 as of the Effective Date.

### H.    Confirmation Not Likely to be Followed by Further Liquidation or Reorganization

In accordance with section 1129(a)(11) of the Bankruptcy Code, Confirmation of the Plan is not likely to be followed by further liquidation.  First, Histogen will not be conducting any business operations after the Effective Date.  Further, the Histogen's property is sufficient to satisfy in full or otherwise reserve for Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims, and the costs and expenses of the Plan Administrator.

## IV.    UNCLASSIFIED CLAIMS

### A.    Administrative Expense Claims

Except to the extent that the Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment with the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction, and in exchange for, its Allowed Administrative Expense Claim, an

---

[6] The Debtor does not believe that there are any claims and/or Causes of Action that would have any recoverable value.

amount of Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim either: (a) if the Administrative Expense Claim is Allowed, on the Effective Date or as soon as practicable thereafter, or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, no later than forty-five (45) calendar days after the date on which an order of the Bankruptcy Court allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (c) if the Allowed Administrative Expense Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claims, without any further action by the Holders of such Allowed Administrative Expense Claims; (d) at such other time that is agreed to by the Debtor or the Plan Administrator, as applicable, and the Holders of such Allowed Administrative Expense Claim; or (e) at such other time and on such other terms set forth by an order of the Bankruptcy Court.

All requests for payment of Administrative Expense Claims must be filed and served pursuant to the procedures specified in the Confirmation Order and notice of entry of the Confirmation Order, if applicable, no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, file and serve a request for payment of such Administrative Expense Claims against the Debtor or its property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be filed with respect to a previously Allowed Administrative Expense Claim.

**B.    Professional Fee Claims**

All requests for payment of Professional Fee Claims must be filed no later than

the Professional Fee Claims Bar Date.   The Debtor or the Plan Administrator, as applicable, shall pay each Allowed Professional Fee Claim in full in Cash on the later of: (a) three (3) Business Days after the Professional Fee Claim is Allowed; and (b) the date agreed to by the Holder of the Professional Fee Claim and the Debtor or the Plan Administrator, as applicable.  Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by the Professional Fee Claims Bar Date.

As set forth in Article X.B, as a condition precedent to the Effective Date, the Debtor shall have funded a Professional Fee Reserve for each of the Professionals in an amount sufficient to cover the amount sought in such Professional's Professional Fee Claims.  In the event an Allowed Professional Fee Claim exceeds the Professional Fee Reserve for the respective Professional, the Debtor, the Wind-Down Debtor, or the Plan Administrator, as applicable, shall be obligated to true-up such Professional Fee Reserve and pay such Allowed Professional Fee Claim in Cash in accordance with the above.  By contrast, in the event an Allowed Professional Fee Claim is less than the Professional Fee Reserve for the respective Professional, the Professional shall be obligated to return any amount in excess of its Allowed Professional Fee Claim to the Liquidating Trust.

**C.    Priority Tax Claims**

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment with the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Priority Tax Claim will receive in full and final satisfaction, settlement, and release, and in exchange for, its Allowed Priority Tax Claim an amount of Cash equal to the full unpaid amount of such Allowed Tax Claim on: (a) the Effective Date; or (b) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as

soon thereafter as is reasonably practicable; provided, however, that Holders of Allowed Priority Tax Claims shall either receive payment in full in the ordinary course of business with such payment being made prior to any delinquency date, under applicable non-bankruptcy law, or shall receive interest on account of such Allowed Priority Tax Claims pursuant to sections 506(b), 511, and 1129 of the Bankruptcy Code.

## V.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.   Classification of Claims

This Plan classifies Claims and Equity Interests for all purposes, including, voting, Confirmation, and Distribution pursuant to sections 1122 and 1123 of the Bankruptcy Code.

### B.   Treatment of Claims and Equity Interests under the Plan

The following chart illustrates the treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims) under the Plan.  Certain Classes may not have Holders of Claims or Equity Interests, and such Classes shall be treated as set forth in this Article V.C.

For the avoidance of doubt, nothing herein shall prevent the Holder of an Allowed Claim or Equity Interest and Wind-Down Debtor or Plan Administrator, as applicable, from agreeing to a less favorable treatment for such Holder in writing.

| CLASS | TITLE | IMPAIRMENT | TREATMENT |
|-------|-------|------------|-----------|
| Class 1 | Secured Claims | Unimpaired / Deemed to Accept | Class 1 is Unimpaired under the Plan.  On the first Distribution Date or on the next Distribution Date following the date the Claim becomes an Allowed Secured Claim, each Holder of an Allowed Secured Claim shall either (i) receive Cash in the full amount of such Allowed Secured Claim, with interest from the Petition Date at the Contract Rate, except to the extent that the Holder of the Allowed Secured Claim agrees to payment on deferred or other such terms, or (ii) at the election of the Debtor, be treated in any other manner so that such Creditor's Allowed Secured Claim is Unimpaired. |

| | | | Class 1 is not entitled to vote and is deemed to accept the Plan. |
|---|---|---|---|
| Class 2 | Priority Claims | Unimpaired / Deemed to Accept | Class 2 is Unimpaired under the Plan.  On the first Distribution Date or on the next Distribution Date following the date the Claim becomes an Allowed Priority Claim, each Holder of an Allowed Priority Claim shall receive Cash in the full amount of such Priority Claim, with interest from the Petition Date at the Contract Rate, except to the extent that the Holder of the Allowed Priority Claim agrees to payment on deferred or other such terms.<br><br>Class 2 is not entitled to vote and is deemed to accept the Plan. |
| Class 3 | General Unsecured Claims | Unimpaired / Deemed to Accept | Class 3 is Unimpaired under the Plan.  On the first Distribution Date or on the next Distribution Date following the date the Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive Cash in the full amount of such General Unsecured Claim, with interest from the Petition Date at the Contract Rate, except to the extent that the Holder of the Allowed General Unsecured Claim agrees to payment on deferred or other such terms.<br><br>Class 3 is not entitled to vote and is deemed to accept the Plan. |
| Class 4 | Equity Interests | Unimpaired / Deemed to Accept | Class 4 is Unimpaired under the Plan.  Each holder of an Allowed Equity Interest shall receive one or more Distributions on a Distribution Date, as determined by the Plan Administrator, in an amount equal to its Pro Rata Share of the Available Cash remaining after payment of Allowed Claims in Classes 1, 2, and 3, Allowed Administrative Claims, and Allowed Priority Tax Claims.<br><br>Class 4 is not entitled to vote and is deemed to accept the Plan. |

## C.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court on the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section

-33-

1129(a)(8) of the Bankruptcy Code, if applicable to Confirmation of this Plan as a consensual plan under section 1191(a) of the Bankruptcy Code.

## VI.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Funding of Plan

The source of funds to achieve Consummation and to carry out the Plan shall be the Available Cash, the Reserves, and any Residual Assets.

### B.    Vesting of Assets in the Wind-Down Debtor

Except as otherwise provided herein, on the Effective Date, the Wind Down Assets shall vest in the Estate of the Wind-Down Debtor, free and clear of all Claims, liens, charges, other encumbrances and Interests. On and after the Effective Date, the Plan Administrator may use, acquire, or dispose of the Wind Down Assets and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### C.    Plan Administrator

The Debtor has selected Armanino to serve as initial Plan Administrator in accordance with the Plan. Successors to the Plan Administrator may be selected by the Plan Administrator or, absent any such selection or approval, order of the Bankruptcy Court.

The Plan Administrator (or its agent) will make all Distributions of Residual Assets provided for under the Plan, except for Distributions to be made to the Holders of Administrative Claims or Distributions to be made on the Effective Date which will be made by the Debtor (or its agent). The Plan Administrator may, but will not be required to, post any bond.

The Plan Administrator shall also represent the Estate for purposes of prosecuting Causes of Action, objecting to any Claims, disbursing monies to Creditors and Holders of Equity Interests under the Plan after the Effective Date, and administering the Reserves.

The Plan Administrator may employ Professionals, including counsel, accountants, and disbursing agents, as needed to assist it in fulfilling its obligations under the Plan, including prosecuting the Causes of Action, objecting to any Claims, filing tax returns, making Distributions (and withholdings thereto), and disposing of the Residual Assets without further order of the Bankruptcy Court. The Plan Administrator is authorized to create reserves for the fees and expenses of such professionals incurred in the investigation and prosecution of Causes of Action or in objecting to any Claims. Such professionals shall submit fee statements in order to receive compensation in accordance with the provisions set forth in Article VI.E hereof.

The Plan Administrator shall not be required to file a fee application to receive compensation. The compensation for the Plan Administrator shall be determined and disclosed prior to the Confirmation Date.

Unless a Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Cause of Action are reserved to the Plan Administrator who may pursue such Cause of Action.

The Plan Administrator may pursue or decline to pursue the Causes of Action assigned to it for prosecution, as appropriate, in the Plan Administrator's business judgment, subject to the provisions of the Plan. The Plan Administrator may settle, release, sell, assign, otherwise transfer or compromise such Causes of Action, in the Plan Administrator's business judgment upon approval by the Bankruptcy Court or as otherwise provided in the Plan.

Except as otherwise set forth in the Plan, the Plan Administrator may, but shall not be required to, set off against any Claim or Equity Interest and the Distributions to be made pursuant to the Plan in respect of such Claim or Equity Interest, any Causes of Action the Estate may have against the Holder of the Claim or Equity Interest, but neither the failure to do so nor the allowance of any Claim or Equity Interest hereunder

shall constitute a waiver or release by the Plan Administrator or Wind-Down Debtor of any Cause of Action, setoff or recoupment which the Plan Administrator or Wind-Down Debtor may have against such Holder.

Upon the liquidation of the Residual Assets and Causes of Action, and disbursement of the Available Cash to Creditors and Holders of Equity Interests, the Plan Administrator shall file a report with the Bankruptcy Court and request the entry of a Final Decree closing the Chapter 11 Case.

### D.    Duties of the Wind-Down Debtor

The Wind-Down Debtor, through the Plan Administrator, shall use reasonable efforts to liquidate, diligently and for the highest value, if any, reasonably possible, the Residual Assets. The Wind-Down Debtor may liquidate or abandon the Residual Assets, including Causes of Action, based on the Wind-Down Debtor's business judgment, without notice or the need for further order of the Bankruptcy Court.

### E.    Agents of the Plan Administrator and Wind-Down Debtor; Payment of Such Agents

In order to carry out its duties under the Plan, the Plan Administrator and/or the Wind-Down Debtor, in addition to its other rights under the Plan, shall have the right, but not the obligation, (a) to retain and compensate professionals (including but not limited to the Professionals retained by the Debtor prior to the Effective Date) and other Persons to assist the Wind-Down Debtor in the liquidation of the Residual Assets, and (b) to employ such other procedures not inconsistent with the Plan.

The procedures for payment of Professionals shall be:

a. A fee statement showing the reasonable and necessary fees and actual and necessary expenses of such Professionals or Persons shall be submitted to the Plan Administrator and the Wind-Down Debtor;

b. The Plan Administrator and the Wind-Down Debtor shall have fifteen (15) days from the service of a fee statement to give notice of objection to the fee

statement to the professional or Person seeking compensation or reimbursement;

c.  Objections must be in writing and shall set forth in detail the specific fees and expenses objected to and the basis for the objection; and

d.  Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution. The uncontested portion of each bill shall be paid within thirty (30) days after its delivery to the Plan Administrator.

**F.      Limitation of Liability; Exculpation of Plan Administrator.**

The Plan Administrator and all professionals retained by the Wind-Down Debtor or Plan Administrator, as applicable, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtor; provided, however, that the foregoing indemnification shall be subject to the parameters, if any, established by any applicable professional rules of responsibility governing such professional. The Plan Administrator and any such professionals may rely upon written information previously generated by the Debtor.

**G.      Directors and Officers**

On the Effective Date, the duties and obligations of the officers and directors of the Debtor shall be discharged and the Board shall be disbanded and management shall be replaced for all purposes and respects by the Plan Administrator.

**H.      Dissolution of the Wind-Down Debtor**

Upon the conclusion of the wind down, the Plan Administrator shall be authorized to dissolve the Wind-Down Debtor, without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the

Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

## VII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

Except for (i) any executory contract or unexpired lease that was previously assumed or rejected by the Debtor pursuant to section 365 of the Bankruptcy Code and (ii) any contract providing for insurance to the Debtor, the Wind-Down Debtor, the Plan Administrator, or any of their respective officers, directors, attorneys, or agents, on the Effective Date each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases.

### B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed with the Bankruptcy Court by any applicable deadline set by Final Order of the Bankruptcy Court and in no event later than thirty (30) days after the Confirmation Date. Any Entity that fails to assert a Claim arising from the rejection of an executory contract or unexpired lease within such time will be forever barred from asserting such Claim against the Debtor, Wind-Down Debtor, any other entity, its estate and/or property, unless otherwise ordered by the Bankruptcy Court or provided in the Plan. All such Claims timely filed will be treated as Unsecured Claims.

### C.     Insurance Preservation

Nothing in the Plan or the Confirmation Order is intended to, nor shall, alter the rights and obligations of the Debtor and its Estate on the one hand, and the Debtor's insurers and third-party claims administrators on the other, under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies.  All of the Debtor's rights under any Insurance Policy to which the Debtor may be a beneficiary shall constitute Residual Assets.  The Debtor shall be deemed to have assumed only the D&O Policy, and any Insurance Policy other than the D&O Policy shall be deemed terminated on the Effective Date.

### VIII.   PROVISIONS GOVERNING DISTRIBUTIONS

#### A.     Distributions for Claims and Equity Interests Allowed as of a Distribution Date

Except as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court, Distributions on account of those Claims and Equity Interests that are Allowed as of the Effective Date and are entitled to receive Distributions under the Plan shall be made on the first Distribution Date, as determined by the Plan Administrator. Distributions on account of Claims and Equity Interests that become Allowed after the Effective Date shall be made pursuant to the provisions of the Plan.  **For the avoidance of doubt, no Distributions shall be made until there is a final resolution of the Harrell Claim.**

#### B.     Manner of Payment

Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Debtor, Wind-Down Debtor or Plan Administrator, as applicable.

Under section 1146(c) of the Bankruptcy Code, the making or delivery of an

instrument of transfer under a plan may not be taxed under any law imposing a stamp tax or similar tax. Pursuant thereto and because the Debtor is liquidating its Assets hereunder, entry of the Confirmation Order shall be a determination that no stamp tax, transfer tax or similar tax may be imposed on any sale of property by the Debtor or Wind-Down Debtor.

The Plan Administrator, in making Distributions under the Plan, shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold the entire Distribution due to any Holder of an Allowed Claim or Equity Interest until such time as such Holder provides the Plan Administrator with the necessary information to comply with any withholding requirements of any governmental unit. Any funds so withheld will then be paid by the Plan Administrator to the appropriate authority. If the Holder of an Allowed Claim or Equity Interest fails to provide the information necessary to comply with any withholding requirements of any governmental unit within sixty (60) days from the date of first notification by the Plan Administrator to the Holder of such Allowed Claim or Equity Interest the need for such information or for the Cash necessary comply with any applicable withholding requirements, then the Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article VIII.D.

**C.      Transmittal of Distributions to Parties Entitled Thereto**

All Distributions by check shall be deemed made at the time such check is duly deposited in the United States mail, postage prepaid. All Distributions by wire transfer shall be deemed made as of the date the Federal Reserve or other wire transfer is made. Except as otherwise agreed with the Holder of an Allowed Claim or Equity Interest in respect thereof or as provided in the Plan, any property to be distributed on account of an Allowed Claim or Equity Interest shall be distributed by mail, upon compliance by the Holder with the provisions of the Plan, to (a) the latest mailing

address Filed for the Holder of an Allowed Claim or Equity Interest entitled to a Distribution, (b) the latest mailing address Filed for a Holder of a Filed power of attorney designated by the Holder of such Claim or Equity Interest to receive Distributions, (c) the latest mailing address Filed for the Holder's transferee as identified in a Filed notice served on the Wind-Down Debtor pursuant to Bankruptcy Rule 3001(e), or (d) if no such mailing address has been Filed, the mailing address reflected on the Schedules, in the Debtor's transfer agent's books and records, the Equity Agent's books and records, or in the Debtor's books and records.

### D.    Disputed Claims and Unclaimed Property

Notwithstanding all references in the Plan to Claims or Equity Interest that are Allowed, in undertaking the calculations concerning Allowed Claims or Equity Interest under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims or Equity Interest, each Disputed Claim or Equity Interest shall be treated as if it were an Allowed Claim or Equity Interest, as appropriate, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim or Equity Interest to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim or Equity Interest (which estimations and determinations may be requested by the Plan Administrator), such amount as determined by the Bankruptcy Court shall be used as to such Claim.

The Distributions due in respect of Disputed Claims or Equity Interests based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims or Equity Interests and held in the Reserve Fund. The amount(s) so reserved on account of a Creditor is referred to herein as the "Reserve Amount."  For the avoidance of doubt, the Plan Administrator, in its discretion, may hold on making any Distributions until all Disputed Claims and/or Equity Interest have been resolved.

After an objection to a Disputed Claim or Equity Interest is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed

Claim or Equity Interest shall be paid by the Plan Administrator from the Reserve Fund to such Creditor or Holder of an Equity Interest. Such payment shall be made on the next Distribution Date for Claims or Equity Interests of the Class or type of the Claim or Equity Interest of such Holder. No interest shall be due to a Disputed Claim or Equity Interest Holder based on the delay attendant to determining the allowance of such Claim except as set forth in this subsection.

Should the Allowed Claim of such Creditor or Holder of an Equity Interest exceed the Reserve Amount, the shortfall may be paid from available sums, if any, for the next Distribution, provided that, in no event shall the Creditor or Holder of an Equity Interest have recourse to (i) any payments already made to others; (ii) sums reserved by the Plan Administrator in connection with Administrative Claims, Other Priority Claims, and Secured Claims; or (iii) other sums reserved for ongoing fees and costs of administering the Estate or effectuating the Plan.

After an objection to a Disputed Claim or Equity Interest is sustained in whole or in part by a Final Order, any Reserve Amount for such Claim or Equity Interest held in the Reserve Fund in excess of the Distribution due on account of any resulting Allowed Claim or Equity Interest may be removed by the Plan Administrator from the Reserve Fund and treated as available funds for ongoing costs and fees or for distribution to other Creditors or Holders of Equity Interests.

At the Plan Administrator's election, any property that is unclaimed for ninety (90) days after Distribution thereof by mail to the last known mailing address of the party entitled thereto, shall revest in the Plan Administrator as available funds for ongoing costs and fees or for distribution to other Creditors or Holders of Equity Interests. Notwithstanding the foregoing, if any mail sent to a Creditor or Holder of an Equity Interest at the last known mailing address by the Plan Administrator is returned without a forwarding address and the Creditor or Holder of an Equity Interest does not claim its Distribution within ninety (90) days after it is mailed to the Creditor, the Plan

Administrator may strike the Creditor's Claim from the Creditor list or Holders' Equity Interest from the list of stockholders, issue no more checks to such Creditor or Holder of an Equity Interest and, for the purposes of future Distributions, treat the Claim or Equity Interest as if it were disallowed.

The Debtor anticipates that it will maintain the following amounts as part of its initial Reserve Fund: (i) $275,000 for to address unanticipated issues that may arise post-confirmation; and (ii) $100,000 to address the Harrell Claim. **For the avoidance of doubt, the Plan Administrator does not intend to make any Distributions until the Harrell Claim is finally resolved.**

### E.    Saturday, Sunday or Legal Holiday

If any payment, Distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or Distribution or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### F.    Fractional Cents

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a Distribution of Cash in whole cents (rounded down to the nearest whole cent when and as necessary).

### G.    De Minimis Payments and Distributions

Notwithstanding any other provision of this Plan, De Minimis Payments need not be made by the Wind-Down Debtor on account of any Allowed Claim or Allowed Equity Interest; provided that De Minimis Payments that would otherwise be made on the Effective Date or a subsequent Distribution Date shall carry over until the next date of a Distribution until the cumulative amount of Distributions to which the Holder of such Allowed Claim or Equity Interest is more than a De Minimis Payment, at which time the cumulative amount of such Distributions shall be paid to such Holder. De Minimis

Payments that will not be distributed as of the final Distribution Date shall be treated as undeliverable Distributions as provided in Article VIII.D above.

Notwithstanding any other provision of this Plan, if and to the extent that the Wind-Down Debtor has Assets including Cash with a value of no more than $10,000 after a Distribution has been made, the Plan Administrator, may in lieu of making further Distributions donate such Cash to a nonprofit organization or organizations that are exempt pursuant to section 501(c) of the Internal Revenue Code (Title 26 of the United States Code); provided that any donations made pursuant to this provision shall be made to a nonprofit organization or organizations that perform or fund community-based services.

**H.    Distributions on account of Equity Interests**

Any or all Distributions on account of Equity Interests may be made by the Plan Administrator or the Equity Agent, or their designee, as applicable.

**IX.    CLAIMS PROCEDURES**

**A.    Allowance of Claims**

After the Effective Date, the Wind-Down Debtor and Plan Administrator shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

**B.    Claims Administration Responsibilities**

Except as otherwise expressly provided in the Plan, after the Effective Date, the Wind-Down Debtor and/or the Plan Administrator shall have the authority to: (i) file, withdraw, or litigate to judgment, objections to Claims or Equity Interests; (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**C.    Estimation of Claims**

The Debtor may, at any time, request that the Bankruptcy Court estimate any Contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute the maximum allowable amount of such Claim.

**D.    Time to File Objections to Claims**

Except as otherwise provided in the Plan, any objections to Claims shall be filed on or before the Claims Objection Deadline (as such date may be extended upon presentment of a motion to the Bankruptcy Court by the Plan Administrator and/or Wind-Down Debtor).

**E.    Disputed Claims**

All Claims held by a Person or Entity against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  A Claim deemed a Disputed Claim pursuant to this Article IX.E shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtor, Wind-Down Debtor or the Plan Administrator from such Holder have been paid.

**X.   CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**

**A.   Conditions Precedent to Confirmation of the Plan**

Confirmation of the Plan is subject to each of the following conditions precedent:

- The Confirmation Order shall approve in all respects all of the provisions, terms, and conditions of this Plan; and

- The Confirmation Order shall be in form and substance acceptable to the Debtor.

**B.   Conditions Precedent to Effective Date**

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent:

- Entry of the Confirmation Order;

- The Confirmation Order shall have become a Final Order; and

- The Debtor shall have funded the Professional Fee Reserve with respect to each Professional submitting a Professional Fee Claim.

**C.   Waiver of Conditions**

The Debtor may waive any of the conditions of the Confirmation and/or Consummation of the Plan, in whole or in part, set forth in this Article X at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of the Plan.

**D.   Effect of Non-Occurrence of Effective Date**

If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor in any respects.

## XI.    RELEASES, INJUNCTIONS, AND RELATED PROVISIONS

### A.    Debtor Releases

On the Effective Date, and pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by the Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtor or its Estate or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's restructuring efforts, intercompany transactions, the Debtor's capital structure, management, ownership, or operation thereof, the various transactions contemplated hereby, the Subchapter V Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, any contract, instrument, release, or other agreement or document created or entered into or from any other act taken or omitted to be taken prior to the Effective Date; provided, however, that nothing herein shall release any of the

**above-listed parties from claims alleging gross negligence, intentional misconduct, or fraud.**

**Notwithstanding, the foregoing release does not release (a) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement or in connection with the Plan, (b) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment arrangement with any current or former employee, (c) the rights of Holders of Allowed Claims or Equity Interests to receive Distributions under the Plan, or (d) the Retained Causes of Action.**

**B.     Exculpation**

**Except as otherwise set forth in the Plan, none of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Equity Interest or other Person or Entity for any action taken or omitted to be taken from the Petition Date through the Effective Date in connection with or related to the filing of the Subchapter V Case, the formulation, preparation, dissemination, solicitation, implementation, Confirmation, or consummation of the Plan or any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, the administration of the Plan, or property to be distributed pursuant to the Plan, and any other postpetition actions taken or omitted to be taken in connection with the Subchapter V Case or the operations, monitoring, or administration of the Debtor during the Subchapter V Case and the post-confirmation administration of the Estate; provided, however, that the foregoing provisions of this exculpation shall not operate to waive, release, or otherwise impair (i) the Retained Causes of Action or (ii) any Causes of Action arising from criminal acts, intentional fraud,**

-48-

gross negligence, or willful misconduct of such Exculpated Party as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

C. **Plan Injunction**

Except as otherwise provided in the Plan or the Confirmation Order, all Persons that held, hold, or may hold a Claim against or Equity Interest in the Debtor are, with respect to such Claims or Equity Interest or any theory that arises out of such Claims or Equity Interests, permanently enjoined, as of the Effective Date, from taking any of the following actions against the Wind-Down Debtor or its assets, including, for the avoidance of doubt, property to be distributed under the Plan: (i) commencing or continuing any manner, directly or indirectly, any action or other proceeding of any kind (including in a judicial, arbitral, administrative, or other forum); (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Liens or encumbrances; (iv) asserting any right of setoff, directly or indirectly, except as otherwise allowed under the terms of this Plan; (v) asserting any right of subrogation; and (vi) prosecuting or otherwise asserting any right, claim, or Cause of Action, released pursuant to the Plan, including, without limitation, any right, claim, or Cause of Action against an Exculpated Party that has been exculpated pursuant to Article XI.C of the Plan; provided, however, that the injunction provided herein shall neither bar any Person from asserting any defense in an action commenced by or on behalf of the Debtor or the Wind-Down Debtor nor prohibit any Person from asserting any right expressly preserved by this Plan. Nothing shall preclude the Holder of a Claim or Equity Interest from pursuing any applicable insurance after the Subchapter V Case is closed, from

-49-

**seeking discovery in actions against third parties, from pursuing third-party insurance that does not cover Claims against the Debtor, or from pursuing third parties for claims not released under this Plan.  For the avoidance of doubt, nothing in this injunction shall limit the rights of a Holder of a Claim or Equity Interests to enforce the terms of this Plan.  Notwithstanding anything to the contrary herein, nothing in this <u>Article XI.D</u> shall enjoin non-discharged Claims or Equity Interests.**

### D.    No Discharge

Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan shall not discharge Claims against the Wind-Down Debtor; provided, however, that no Holder of a Claim or Equity Interest may, on account of such Claim or Equity interest, seek or receive any payment or other Distribution from, or seek recourse against, the Wind-Down Debtor or the Wind-Down Debtor Assets, except as expressly provided in the Plan.

### E.    Cause of Action Injunction

On and after the Effective Date, all Persons other than the Wind-Down Debtor and/or Plan Administrator will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of, or respecting any claim, debt, interest, right, or Cause of Action that the Wind-Down Debtor/Plan Administrator retain authority to pursue in accordance with the Plan.

### F.    Retained Causes of Action

Except as otherwise expressly set forth in the various release or exculpation provisions of the Plan or the Confirmation Order, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all proceeds of Retained Causes of Action shall become property of the Wind-Down Debtor on the Effective Date.  Notwithstanding any otherwise applicable principle of law or equity, the failure to list, disclose, describe, identify,

analyze, or reference any particular Retained Cause of Action in the Plan or any other document to be filed with the Bankruptcy Court is not intended to, and will not, waive, eliminate, modify, release, or alter the rights of the Debtor or the Wind-Down Debtor, as applicable, to commence, prosecute, defend, settle, or otherwise realize upon any retained claims and defenses that the Debtor may have as of the Effective Date.  Such Retained Causes of Action shall include, without limitation:

- all claims, Causes of Action, defenses, and transfers listed or referred to in the Plan Supplement;

- all claims, Causes of Action, defenses, and transfers listed or referred to in the Schedules and Statements;

- all claims and defenses pursuant to applicable non-bankruptcy law and sections 502, 506, 524, and 553 of the Bankruptcy Code against any creditor regarding the amount of such Holder's Allowed Claim (whether prepetition or postpetition) to enforce the discharge of any secured creditor's Claim;

- all claims and defenses pursuant to applicable non-bankruptcy law and sections 502, 506, 510, 524, and 553 of the Bankruptcy Code, including, without limitation, claims and defenses based on any creditor's assertion of unreasonable professional fees, costs, charges, or penalties;

- all Causes of Action and objections to Claims under sections 105, 502, 506, 510, 542–551, and 553 of the Bankruptcy Code that are property of the Debtor's Estate under section 541 of the Bankruptcy Code;

- all claims and defenses related to the recovery of professional fees and expenses by the Debtor from creditors;

- all Causes of Action, including, without limitation, relating to pre-confirmation or prepetition conduct, such as claims for the violation of the automatic stay under section 362 of the Bankruptcy Code, tortious

interference, claims for fraud, breaches of fiduciary duties, or negligence; and

- all Avoidance Actions.

## XII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising out of or related to the Subchapter V Case for, among other things, the following purposes:

- to hear and determine all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance of cure amounts and Claims resulting therefrom;

- to hear and determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

- to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of an Claim against or Equity Interest in the Debtor, including the resolution of any request for payment of any Claim or Equity Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims and Equity Interests;

- to ensure that Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to Distributions under the Plan;

- to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the bankruptcy Court under section 330 or 503 of the Bankruptcy Code;

- to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument, or other document governing or relating to any of the foregoing;

- to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, except as otherwise provided herein;

- to issue orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

- to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 502, 505, and 1146 of the Bankruptcy Code;

- to determine any other matters that may arise in connection with or are related to the Plan, the Confirmation Order, any of the Plan Documents, or any other contract, instrument, release, or other agreement or document related to the Plan or the Plan Supplement;

- to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Subchapter V Case, the applicable Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Equity Interest is discharged hereunder, or for any other purpose;

- to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Subchapter V Case (whether or not the Subchapter V Case has been closed);

- to hear and determine all disputes involving the existence, nature, or scope of the releases provided for in this Plan;

- to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor or the Wind-Down Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

- to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Subchapter V Case with respect to any Person;

- to hear any other matter related to the Plan and not inconsistent with the Bankruptcy Code; and

- to enter a Final Decree closing the Subchapter V Case.

## XIII.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

### A.    Modification of Plan

Prior to the entry of the Confirmation Order, subject to section 1193(a) of the Bankruptcy Code, the Debtor reserves the right to supplement, amend, or otherwise modify the Plan from time to time.  After entry of the Confirmation Order, but prior to the substantial consummation of the Plan, pursuant to section 1191(a) of the Bankruptcy Code, the Debtor may modify the Plan, but must seek Confirmation of such modified plan after notice and a hearing.  If the Confirmation Order confirms this Plan under

section 1191(b) of the Bankruptcy Code, the Debtor may modify the Plan at any time within three (3) years, or such longer time not to exceed five (5) years, as fixed by the Bankruptcy Court, subject to the requirements of section 1191(b) of the Bankruptcy Code, but must seek Confirmation of such modified plan after notice and a hearing. After the Effective Date, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

**B.**     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved under section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.**     **Revocation of Plan**

Subject to the conditions precedent to the Effective Date, the Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans.  If the Debtor revokes or withdraws the Plan, or if the Effective Date does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against or any Equity Interests in the Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission of any sort by the Debtor or any other Entity.

**XIV.**   **REMEDIES FOR DEFAULT**

Pursuant to section 1191(c)(3)(B) of the Bankruptcy Code, in the event that the Debtor does not perform all of their material obligations under the Plan, the following

provisions control.

### A. Material Default

If the Debtor fails to perform any material obligations required under the Plan for more than 14-days after the time specified in the Plan, the affected creditor or equity interest owner may serve upon the Debtor and counsel to the Debtor a written notice of default.  The Debtor will be deemed to be in material default under the Plan if the Debtor fails, within 21-days of the actual receipt of such notice of default, to either (i) cure the default or (ii) file a motion seeking to obtain from the Bankruptcy Court either (a) an extension of time to cure the default or (b) a determination that no default occurred.

### B. Remedies

In the event that the Debtor fails to cure a material default, obtain an extension of time to cure the default, or obtain a determination that no default has occurred, pursuant to section 1191(c)(3)(B)(ii) of the Bankruptcy Code, the affected creditor may: (i) take any actions permitted under applicable non-bankruptcy law to enforce the terms of the Plan; or (ii) move to dismiss the Subchapter V Case or convert the Subchapter V Case to a case under chapter 7 of the Bankruptcy Code.

## XV. MISCELLANEOUS

### A. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be effective and enforceable immediately, and shall be deemed binding upon the Debtor, including the Wind-Down Debtor and the Plan Administrator, and any and all Holders of Claims and Equity Interests (irrespective of whether such Holders of Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to

Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including under Bankruptcy Rule 3020(e), 6004(g), and 7062.

**B.**    **Headings**

The headings or article titles in the Plan are for convenience only and shall not limit or otherwise affect the provisions of the Plan.

**C.**    **Notices**

Any notice required or permitted to be provided under the Plan, unless otherwise provided herein, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, (c) email, or (d) overnight delivery service, postage prepaid and addressed as follows:

If to the Debtor:

Histogen, Inc.
c/o Armanino LLP
15950 N. Dallas Parkway
Suite 600
Dallas, TX 75248
Attn: Dave Maggio; Zack Parkins
Email: Dave.Maggio@armanino.com
        Zack.Parkins@armanino.com

With a copy, which shall not constitute notice, to:

DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
Attn: Eric D. Goldberg; David M. Riley
Email: Eric.Goldberg@us.dlapiper.com
        David.Riley@us.dlapiper.com

If to the U.S. Trustee:

Office of the United States Trustee
Edward J. Schwartz Office Building
880 Front Street Third Floor, Suite 3230
San Diego, CA 92101
Attn: Elvina Rofael
Email: elvina.rofael@usdoj.gov

If to the Subchapter V Trustee:

Marshack Hays Wood LLP
870 Roosevelt
Irvine, CA 92620
Attn: David A. Wood
Email: dwood@marshackhays.com

### D.    Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with the laws of the State of Delaware.

### E.    Severability

Should any provision of the Plan be deemed unenforceable after the Effective Date, such determination shall not limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

### F.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed to be an admission by any Person with respect to any matter set forth herein.

### G.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  The filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims or Holders of Equity Interests before the Effective Date.

*[Signatures to follow]*

Dated: ~~July~~ September 9, 2024

By: _____

Dave Maggio, Chief Executive Officer for Histogen, Inc.

Submitted by:

DLA Piper LLP (US)

_____

/s/ Eric D. Goldberg

Eric D. Goldberg
David M. Riley
Counsel for Debtor-in-possession Histogen, Inc.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT A</u>**

<span style="color:blue"><u>**Amended**</u></span> **Liquidation Analysis**

| Summary report: Litera Compare for Word 11.2.0.54 Document comparison done on 9/9/2024 1:43:03 PM | |
|---|---|
| **Style name:** DLAPiper | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://cloudimanage.com/ACTIVE/1612664660/1 | |
| **Modified DMS:** iw://cloudimanage.com/ACTIVE/1612664660/2 | |
| **Changes:** | |
| Add | 17 |
| Delete | 18 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 35 |